2026 IL App (1st) 240450
Nos. 1-24-0450 and 1-24-0451 (consolidated)

SIXTH DIVISION
March 31, 2026

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL WHITE, Individually and as Independent Executor of the Estate of Darci White, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18 L 8040 |
| ADVOCATE CONDELL MEDICAL CENTER; RONALD SHENFELD, M.D.; and INFINITY HEALTHCARE PHYSICIANS, LLC, | ) ) ) ) | Honorable Bridget Hughes, |
| Defendants-Appellants. | ) ) | Judge presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Hyman and Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1       This is a medical negligence case brought by Michael White (plaintiff), individually and as independent administrator of the estate of his late wife, Darci White (Darci).

¶ 2       On August 13, 2016, Darci passed away approximately four hours after she was taken to the emergency room at Advocate Condell Medical Center (Advocate) and treated by Dr.

Ronald Shenfeld. Dr. Shenfield is employed by Infinity Healthcare Physicians. LLC, who is also a named defendant.[1]

¶ 3        Following trial in October 2023, the jury returned a verdict in favor of plaintiff in the amount of $25 million. That amount included itemized awards of $3 million for plaintiff's "grief and sorrow" and $5 million for plaintiff's "loss of society."

¶ 4        After the trial court denied posttrial motions by Advocate and Dr. Shenfeld, in February 2024, the trial court entered judgment on the verdict, specifying that plaintiff could also recover prejudgment interest. Advocate and Dr. Shenfeld filed separate appeals, which have been consolidated.

¶ 5        On appeal, Advocate and Dr. Shenfeld assert they were entitled to a directed verdict or judgment notwithstanding the verdict (JNOV) because plaintiff's expert testimony was insufficient to prove negligence and causation. They otherwise urge they are entitled to a new trial because the verdict was against the manifest weight of the evidence, the trial court erred with respect to certain evidentiary rulings, the trial court erred in denying a requested jury instruction, and because the verdict was excessive. In the alternative to a new trial, defendants seek reduction of the verdict. Finally, defendants challenge the prejudgment interest award pursuant to section 2-1303(c) of the Code of Civil Procedure. 735 ILCS 5/2-1303(c) (West 2022).

¶ 6        For the following reasons, we reject all of defendants' arguments and affirm the judgment entered on the jury's verdict.

¶ 7                                BACKGROUND

---

[1]Dr. Shenfeld and Infinity Healthcare Physicians, LLC, are represented by the same counsel in this appeal. For ease of reference, we use "Dr. Shenfeld" to refer to both defendants.

¶ 8        Darci and plaintiff were married in 1993. Together, they had one son, Ryan, born in 2003.

¶ 9        The allegations in this case pertain only to care rendered on August 13, 2016, the date of Darci's death. The record reflects that three weeks earlier, July 23, 2016, Darci went to an urgent care facility affiliated with Advocate complaining of chest pain and shortness of breath. After a chest X-ray, Darci was discharged and prescribed an antibiotic. She had a follow-up appointment with her primary care physician two days later, July 25, 2016. The note from that visit reflects that she was assessed with hiatal hernia, gastroesophageal reflux disease, and atelectasis.[2]

¶ 10        Dr. Shenfeld was not involved in her care at that time. Darci was discharged the following day. ¶ 10   Separately, on July 29, 2016, (approximately two weeks before her death), Darci went to the emergency room at Advocate stating that she had suffered from diarrhea and abdominal pain since the prior evening.

¶ 11        On the evening of August 13, 2016, Darci experienced an episode of syncope (temporary loss of consciousness) while she and Ryan were going to a store. An ambulance transported her to Advocate's emergency department.

¶ 12        In the ambulance on the way to the hospital, Darci experienced further brief syncopal episodes. At one point in the ambulance, Darci was given supplemental oxygen.

¶ 13        At approximately 6:30 p.m., Darci arrived at the emergency department at Advocate. Shortly thereafter, she was seen by an emergency room nurse, Amy Spaid, RN (Nurse Spaid). Darci was examined by Dr. Shenfeld, an emergency physician.

---

[2]"Atelectasis happens when lung sacs (alveoli) can't inflate properly, which means blood, tissue and organs may not get oxygen. It can be caused by pressure outside of your lung, a blockage, low airflow or scarring." *Atelectasis*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/17699-atelectasis (Nov. 10, 2022) [https://perma.cc/2RZK-ZL5G].

¶ 14        Medical records reflect that Darci experienced three additional brief syncopal episodes at 6:40 p.m., 7:10 p.m., and 7:28 p.m. Around 8:15 p.m., Darci complained of shortness of breath and chest pain. Minutes later, at 8:19 p.m., Dr. Shenfeld ordered a computed tomography angiogram (CTA).[3]

¶ 15        Around 8:50 p.m., Darci went into full cardiopulmonary arrest, or "code blue." At 9:37, a critical care physician, Dr. Kutty, was consulted.[4] Darci passed away at 10:41 p.m., approximately four hours after arriving in the emergency room. An autopsy found that she had "massive acute pulmonary thromboemboli within each of the mainstem bilateral pulmonary arteries."

¶ 16        Plaintiff commenced this lawsuit by filing a complaint in July 2018. Plaintiff alleged that although Darci had "known risk factors for pulmonary embolism," defendants deviated from the standard of care in various ways, including alleged failures by Nurse Spaid and Dr. Shenfeld, and that such negligence resulted in Darci's death.[5]

¶ 17                                 Rulings on Motions *in Limine*

¶ 18        The parties conducted numerous depositions of fact and expert witnesses. In plaintiff's deposition, he testified that he was in a romantic relationship with another woman, Megan Markowski. The relationship began in "late 2016," after Darci's death in August 2016. Markowski was deposed and likewise indicated that she and plaintiff were in a committed

---

[3]"A computed tomography (CT) angiogram is a test that makes detailed pictures of your blood vessels and nearby tissues. The most common reason to have a CT angiogram is to see if you have narrowed or blocked coronary arteries ***." See *CT Angiogram*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/ct-angiogram (May 15, 2025) [https://perma.cc/LC3T-EPWT].

[4]There is no allegation of negligence regarding Dr. Kutty.

[5]Plaintiff initially made claims against additional parties, but those claims were dismissed and are not at issue in this appeal.

romantic relationship since late 2016. They began cohabiting in December 2020 in a home owned by plaintiff, and Markowski contributed to expenses such as utilities.

¶ 19     Before trial, plaintiff filed a motion *in limine* to bar introduction of evidence of his relationship with Markowski. The court granted that motion.

¶ 20     Certain other pretrial rulings are relevant to this appeal. Among these, the court denied Dr. Shenfeld's and Advocate's motions to bar plaintiff from presenting expert testimony from two experts in emergency medicine on the ground that their testimony would be identical and unduly cumulative. In a separate ruling, the court granted Advocate's motion *in limine* to bar any opinions or testimony regarding "alleged documentation or charting deficiencies" or errors in medical documentation.

¶ 21                                         Trial

¶ 22     The case proceeded to a jury trial, where plaintiff argued that both Advocate and Dr. Shenfeld were liable because Dr. Shenfeld deviated from the standard of care in three respects. Specifically, plaintiff claimed that Dr. Shenfeld (1) failed to consider a pulmonary embolism earlier, (2) failed to perform a point-of-care ultrasound (POCUS), and (3) failed to administer anticoagulant drugs, namely heparin or tissue plasminogen activator (tPA). Plaintiff also asserted that Advocate was liable due to Nurse Spaid's failure to communicate certain information to Dr. Shenfeld.

¶ 23                                    *Ryan White*

¶ 24     Ryan White, plaintiff and Darci's son, testified that he was 13 years old on August 13, 2016. Around 6 p.m., he was walking with his mother toward a store entrance when she said that she was not feeling well and collapsed. She was briefly unconscious, for "under a minute."

Ryan stayed with his mother until an ambulance arrived. He spoke with her as she was placed into an ambulance. Ryan's father (plaintiff) arrived, and they drove to the hospital.

¶ 25   At the hospital, Ryan and his father spent hours with Darci in her room. They tried to comfort her, and she spoke with them. He recalled that his mother had additional brief episodes of losing consciousness, and it each time it "seemed to worsen and become more violent." At one point, his mother stopped breathing, and he and his father were asked to leave the room. Sometime later, he was asked to come back to his mother's room and say goodbye.

¶ 26   *Plaintiff Mike White*

¶ 27   Plaintiff testified that shortly before 6 p.m., Darci called him and told him that she had collapsed. Plaintiff drove to Darci's location, where he saw Ryan as well as an ambulance with paramedics speaking to Darci. He and Ryan followed the ambulance in his car, and they arrived at the hospital around 6:30 p.m.

¶ 28   Plaintiff and Ryan had to wait for some time before they were allowed to go into Darci's room. Plaintiff was in the room for the next three or four hours, during which time various medical personnel (whose names he did not recall) spoke to Darci and gave her tests.

¶ 29   Plaintiff recalled at one point, Darci was in the midst of talking to a medical person when she gasped and looked surprised, "mouth open, eyes open," and "not breathing not talking." That episode lasted about 20 or 30 seconds, after which Darci asked, "[D]id I pass out again?" After that event, plaintiff continued to speak with Darci, who "seemed completely normal." Later, plaintiff witnessed a similar episode while only he, Ryan, and Darci were in the room. Darci said she thought she was going to pass out and then "froze" with her mouth and eyes open. Plaintiff flagged down someone outside the room, after which a nurse arrived and asked Darci several questions.

¶ 30    Plaintiff also recalled a third event when Darci stopped talking for about 20 to 30 seconds. Plaintiff again went out for help. After that third event, medical personnel "put some tubes up [Darci's] nose for oxygen," and he did not speak to her as much, although Darci remained lucid.

¶ 31    Plaintiff recalled that later, Darci complained of a "crushing feeling in [her] chest," so Ryan left the room and brought back medical personnel. A short time later, he and Ryan were asked to leave and they were directed to a waiting room.

¶ 32    Sometime later, plaintiff spoke with Dr. Kutty as well as a nurse. He and Ryan were then allowed to see Darci, who was deceased.

¶ 33    Plaintiff's counsel asked if plaintiff missed her, and he answered affirmatively. When asked if his life was different, he answered: "Yes, a hundred percent." Asked if he tried to "pick up the responsibilities" that Darci had handled with respect to Ryan, plaintiff testified: "I pledged to [Ryan] at the moment we stood over her that it was going to be him and I, and I said I'm not going — it's just going to be the two of us, and I'm not going to let you down." Plaintiff testified that "I got [Ryan] through his grade school and high school years as best as I could."

¶ 34    *Andrew Katzner*

¶ 35    Andrew Katzner, a paramedic, testified that he and his partner responded to the scene after Darci passed out. He was in the ambulance with Darci for approximately 30 minutes as they transported her. According to his records, Darci denied that she had chest pain or shortness of breath. Katzner recorded that Darci experienced two brief syncopal episodes in the ambulance, during which she was unresponsive. His report reflected that, at one point, she was provided supplemental oxygen.

¶ 36    Katzner testified that when he brings patients to a hospital, his practice is to call the hospital's emergency communication registered nurse (ECRN) and communicate information about the patient before they arrive. Katzner identified an audio recording of his call to the ECRN regarding Darci. That recording was played before the jury. Katzner agreed that the audio recording of that call reflected that Darci's oxygen saturation level (sometimes referred to as "SPO2") had been measured at 88%.

¶ 37    Katzner testified that, consistent with his practice as a paramedic, he drafted a written report of his observations and the treatment provided to Darci. Katzner acknowledged that his written report did not specify an 88% oxygen measurement, although he recorded that she was given supplemental oxygen at 6:27 p.m. The report indicated that her oxygen level subsequently improved to 94% before she arrived at the hospital.

¶ 38    Katzner testified that when he transported a patient to a hospital, his practice was to provide the ECRN "with everything that I had" regarding information about the patient.

¶ 39                                *Stephanie Nelson, RN*

¶ 40    Stephanie Nelson, RN (Nurse Nelson), acknowledged that she was the ECRN who received a call from paramedics before Darci arrived at the hospital. Nurse Nelson had no independent recollection of Darci. She acknowledged that as ECRN, it was her responsibility to communicate information from the paramedics to the nurse to whom the patient was assigned. As was her practice, she documented the information in a radio call log.

¶ 41    Nelson agreed that the audio recording of the call she received from paramedics indicated that Darci's SPO2 dropped to 88% before supplemental oxygen was given, after which it increased to 94%. She agreed that the normal range for SPO2 is 95% to 100%. Nelson agreed

that the audio recording indicated Darci had two syncopal episodes in the ambulance. However, in her radio call log, Nelson "just wrote syncope once."

¶ 42    Nurse Nelson assigned Darci to Nurse Spaid. Nurse Nelson never spoke to Dr. Shenfeld about Darci.

¶ 43                                  *Amy Spaid, RN*

¶ 44    Nurse Spaid testified she had no independent recollection of Darci, but hospital records indicated that Darci arrived at 6:30 p.m. and that Nurse Spaid spoke to her shortly thereafter. Nurse Spaid's corresponding triage note from 6:40 p.m. stated that "Patient brought in by EMS for episode of syncope while walking into store. Patient complains of left ankle pain." The note reflected that Darci was alert and oriented, and she stated that she had been in the hospital "two weeks ago." Nurse Spaid's 6:40 p.m. note recorded that Darci stated "she feels like it is going to happen again" and had a brief episode where she made "grunting noises" and her "eyelids flickered," but Darci regained alertness and was "immediately able to tell me her medications." According to the note, Darci denied chest pain or shortness of breath. Darci's oxygen level was recorded at 96% at 6:44 p.m.

¶ 45    Nurse Spaid testified that when she saw Darci, she was unaware that Darci had additional syncopal episodes in the ambulance, nor did she know that Darci's oxygen saturation level had dropped to 88 percent in the ambulance. She indicated that she would have communicated that information to Dr. Shenfeld, had she known about it.

¶ 46    Nurse Spaid acknowledged that medical records showed Darci experienced three syncopal episodes after arrival at the hospital, at 6:40 p.m., 7:10 p.m., and 7:28 p.m. Although she did not have a specific recollection, Nurse Spaid testified that she would have informed Dr.

Shenfeld about those episodes because "I would not expect him to know what happened with the patient unless I told him."

¶ 47        Elsewhere, Nurse Spaid acknowledged that Darci had an oxygen reading of 89% at 8 p.m., after which Darci was placed on a nasal cannula for supplemental oxygen. Nurse Spaid did not have a specific recollection of communicating that 89% reading to Dr. Shenfeld. Nurse Spaid acknowledged that several hours later, she modified the chart to reflect that the reading was 94% instead of 88%. She did not specifically recall why she made that change, although she agreed it possibly reflected that Darci's oxygen level increased to 94% after receiving supplemental oxygen.

¶ 48                                *Dr. Shenfeld*

¶ 49        Dr. Shenfield testified he had no independent recollection of the treatment he provided to Darci, so he had to rely on the medical records. He explained that he did not personally enter notes when he examined Darci; he treated her in presence of a "scribe" who observed and recorded information into the medical records "in real time."

¶ 50        Dr. Shenfeld acknowledged that when he saw Darci, he had the ability to access records of her prior visits to Advocate healthcare facilities. Given his custom and practice, he stated that he "probably" reviewed those records. However, Dr. Shenfeld disagreed when plaintiff's counsel asked if they "raise[d] the index of suspicion" for pulmonary embolism.

¶ 51        The medical records reflected that Dr. Shenfeld first saw Darci at 6:33 p.m. and that her chief complaint was syncope. Darci indicated that she had "felt lightheaded" and "passed out" on her way to a store. Dr. Shenfeld agreed that syncope is an unexpected, transient "loss of consciousness or near loss of consciousness."

¶ 52    The records reflected that Darci stated she had an episode of diarrhea the prior day and that two weeks earlier she was treated in the hospital for diarrhea. The medical records stated that Darci's normal blood pressure was in the "90s/50s." Darci denied weakness, numbness, dizziness, chest pain, shortness of breath, or headache.

¶ 53    Dr. Shenfeld agreed that syncope is very rarely a sign of pulmonary embolism, whereas dehydration is a common cause of syncope. He testified that after he first met Darci, he engaged in a "differential diagnosis" by which he considered a number of possible causes for Darci's symptoms. He initially considered dehydration as a possible cause; his treatment plan was to give her fluids and to observe and "reassess." He agreed that "dehydration was the No. 1 item" in his differential diagnosis until about 8:15 p.m.

¶ 54    Dr. Shenfeld acknowledged Darci had a rapid heart rate (tachycardia), which he believed was attributable to dehydration and bleeding. He ordered an electrocardiogram (ECG), as he "was considering arrythmia." The corresponding ECG report was time-stamped 7:40 p.m. Dr. Shenfeld interpreted the report as showing an abnormally rapid heart rate.

¶ 55    Dr. Shenfeld testified that he first considered pulmonary embolism at 8:15 p.m., after Darci complained of chest pain and shortness of breath. Before that time, he did not consider pulmonary embolism on his differential diagnosis. Within minutes, at 8:19 p.m., Dr. Shenfeld ordered a CT angiogram to rule out pulmonary embolus. However, that test was never performed, because Darci went into full cardiopulmonary arrest at 8:50 p.m.

¶ 56    Dr. Shenfeld testified that he could not personally perform or interpret a POCUS, but that he could call other physicians to do so. Dr. Shenfield eventually called Dr. Kutty, who performed a bedside echocardiogram. Dr. Shenfeld acknowledged that, in his deposition, he

stated that could have called Dr. Kutty earlier. Dr. Shenfield agreed that he is authorized to order tPA, a "clot buster" drug.

¶ 57    Elsewhere, Dr. Shenfeld agreed that nothing in the medical records indicated that he was ever told that Darci's oxygen level had been 88%.

¶ 58                              *Dr. Christopher L. Moore*

¶ 59    Plaintiff elicited testimony from multiple expert witnesses. Plaintiff called Dr. Christopher L. Moore as an expert in emergency medicine.

¶ 60    Dr. Moore testified that hypoxic means a low oxygen level and is potentially dangerous. He testified that normal oxygen saturation is 96 percent or higher, "borderline" hypoxia is 93 to 95 percent, and 92 percent or lower is hypoxic. Darci's recorded 88 percent level on the way to the hospital was hypoxic.

¶ 61    Dr. Moore testified that a pulmonary embolism is typically a blood clot that obstructs circulation to the lung. It usually travels from lower extremities through the heart into the pulmonary artery "where it lodges because it can't get through the lungs."

¶ 62    Dr. Moore opined that an emergency room physician should be able to perform a point of care transthoracic ultrasound. He opined that Dr. Shenfeld violated the standard of care in that he did not consider "pulmonary embolus early on in the course given this patient had hemodynamic instability, repeated syncope, hypoxia." He also opined that Dr. Shenfeld violated the standard of care because he failed to perform a POCUS "soon after the patient's arrival" or to "immediately" find someone who could.

¶ 63    Dr. Moore also opined that "it was a deviation to not initiate [anticoagulation] therapy sooner including heparin which is a blood thinner" or tPA.

¶ 64 Dr. Moore testified that if Dr. Shenfield had "considered pulmonary embolism early" and had a POCUS been performed, "he would have realized it was a large pulmonary embolism," and therapy could have been initiated sooner, including heparin. Had such therapy been initiated, "it would more likely than not have prevented her from dying."

¶ 65 Dr. Moore also opined that a POCUS performed between 6:33 p.m. and 8:15 p.m. would have shown "very obvious" "right ventricular dilation," or "right heart strain," indicating a blockage by pulmonary embolism. Dr. Moore also agreed that had anticoagulant medication been administered around the time of the "code blue" around 8:50 p.m., it was "very likely" to help Darci recover.

¶ 66 *Dr. Jeffrey Kline*

¶ 67 Following Dr. Moore's testimony, defendants renewed their motion *in limine* to bar cumulative testimony from another plaintiff's expert witness, Dr. Kline. Defendants urged that in light of Dr. Moore's testimony, there were no further issues to cover with Dr. Kline. Plaintiff's counsel argued Dr. Kline's testimony would differ in that it would focus on the development of thromboembolism, and there would only be "slight overlap" with Dr. Moore's testimony. The court permitted plaintiff to call Dr. Kline.

¶ 68 Dr. Kline testified that the vast majority of pulmonary embolisms occur after deep vein thrombosis (DVT). He described how a clot in a vein can become a pulmonary embolism. He interpreted Darci's autopsy results as showing a large clot in the pulmonary artery as well as some "distal clots" in the right and left main stem arteries.

¶ 69 Dr. Kline testified that Dr. Shenfeld "should have considered pulmonary embolism as the number one or number two cause of Darci White's passing out spells and ordered a diagnostic test for pulmonary embolism upon his first encounter" with her. On that point, he explained

that Darci "presented with passing out which is a known symptom or occurrence that can happen with blood clots in the lung," her oxygen level had dipped to 88 percent, she had "heart rate of 110 and a blood pressure of 96," and she was taking estrogen which was a "risk factor" for pulmonary embolism.

¶ 70    He also opined that Dr. Shenfeld should have used a "cardiac ultrasound at the bedside," or POCUS, "on his first encounter" or "as soon as possible thereafter." He opined that an emergency physician should know how to do a POCUS or "should be able to have it arranged quickly." He also opined that Dr. Shenfeld should have consulted with a critical care pulmonologist "earlier."

¶ 71    Dr. Kline believed that had a POCUS been ordered earlier, it would have shown the right side of the heart was swollen as a result of clots in the lungs. Then, the next steps should have been to give heparin and "take the patient immediately" for a CT scan, which "is the way we diagnose clots in the lungs."

¶ 72    Dr. Kline acknowledged that on the way to the hospital, Darci had two syncopal episodes and that her oxygen level was measured at 88%. He believed this was caused by the clot blocking blood flow.

¶ 73    *Leslie Boyd, RN*

¶ 74    Leslie Boyd, RN, testified as plaintiff's expert in emergency nursing care. She opined that Nurse Spaid deviated from the standard of care by failing to communicate to Dr. Shenfeld that Darci's prearrival oxygen level had dropped to 88% or that Darci had two additional syncopal episodes en route to the hospital. Further, Nurse Boyd opined that Nurse Spaid failed to timely communicate that Darci had three subsequent syncopal episodes in the emergency room and failed to timely communicate a decrease in her oxygen level at 8 p.m.

- 14 -

¶ 75                                    *Dr. Gary Salzman*

¶ 76          Plaintiff called Gary Salzman, M.D., as an expert in pulmonary and critical care medicine. Dr. Salzman testified to his opinion that from the time she arrived at the hospital at 6:30 p.m., Darci was "hemodynamically unstable," meaning her heart was not adequately delivering blood to her vital organs. He based this on her elevated heart rate, low blood pressure, and episodes of syncope.

¶ 77          Dr. Salzman opined that Darci had a number of different blood clots from the time she first passed out. Each time she passed out, including the syncopal episodes in the ambulance and in the emergency department, indicated another blood clot. He believed this "recurrent shower of blood clots stack[ed] up one among the other causing more and more obstruction into her lungs," which in turn strained her heart. After "seven times of passing out and seven episodes of blood clots," her heart "couldn't take it anymore," and she went into cardiopulmonary arrest at 8:50 p.m. Although Dr. Kutty later diagnosed a massive pulmonary embolism and she was given a "clot busting drug," it was "late" and the drug "didn't work" to prevent her death.

¶ 78          Dr. Salzman opined that if a POCUS had been performed sometime between 6:30 p.m. and 8:30 p.m., it would show the right ventricle was larger than normal and not pumping adequately. He believed that if a critical care physician had been consulted before 8:50 p.m., he or she would "suspect a blood clot" and perform an ultrasound. He testified that a critical care doctor would initially treat with the anticoagulant heparin to stabilize the clot, and the next step would be to give the "clot buster drug," tPA, to dissolve the clot.

¶ 79          Dr. Salzman believed that had a POCUS been performed before 8:30 p.m., Darci would have been administered heparin and would have survived. He also believed that she had a chance of survival if tPA had been ordered before 9:10 p.m.

¶ 80                    *Denial of Motions for Directed Verdict*

¶ 81        After the close of plaintiff's case, both Dr. Shenfeld and Advocate moved for a directed verdict. The court subsequently denied both motions.

¶ 82                              *Dr. Mark Cichon*

¶ 83        Dr. Shenfeld called Dr. Mark Cichon, who testified as an expert in emergency medicine.

¶ 84        Dr. Cichon opined that Dr. Shenfeld complied with the standard of care and did not contribute to Darci's death.

¶ 85        Dr. Cichon explained that when Dr. Shenfeld first saw Darci around 6:30 p.m., she did not have symptoms of pulmonary embolism. Darci was alert and communicating. She did not have risk factors for pulmonary embolism such as recent surgery, prior stroke, recent trauma, smoking, or pregnancy. Although she was on oral contraceptives, the records indicated she did not report this to Dr. Shenfeld.

¶ 86        Dr. Cichon testified that Darci showed signs consistent with dehydration, such as low urine output and dry mucus membranes. Dr. Cichon agreed that the ECG performed at 7:40 p.m. did not show heart strain or "evidence of an acute cardiac event that needed immediate intervention." Dr. Cichon agreed that Darci's condition changed significantly at 8:15 p.m. and that Dr. Shenfeld acted appropriately by ordering a CT angiogram at 8:19 p.m.

¶ 87                        *Dr. Jesse Russell Booth Hall*

¶ 88        Dr. Jesse Russell Booth Hall testified as Dr. Shenfield's expert in critical care medicine. Dr. Hall testified that syncope has various possible causes, including dehydration. Dr. Hall stated that Darci's oxygen saturation rate at 6:44 p.m. was 96%, indicating "normal oxygenation." At that point, she was "hemodynamically stable."

¶ 89    Dr. Hall believed that around 8:15 p.m., the blood clot, which had "been causing her to pass out," "finally did travel to the lung and was overwhelming to her heart and lung function."

¶ 90    He testified that the autopsy report indicated a very large "saddle embolus" that blocked both main branches of the pulmonary arteries leading to right and left lungs. Dr. Hall denied that the autopsy indicated several separate pulmonary embolism events.

¶ 91    Dr. Hall noted that on July 23, 2016 (three weeks before her death), Darci sought medical attention complaining of pain in her chest. Dr. Hall believed that Darci had a relatively small pulmonary embolism at that time that resolved. Dr. Hall believed that in the weeks before Darci's death, a clot was growing in size that eventually broke off and traveled through her heart over the course of two hours on August 13, 2016. He explained that such a slow-moving "clot-in-transit" is very rare, affecting only "1 in 1,000 or 1 in 10,000" of people with a pulmonary embolism. Dr. Hall opined that this same clot caused each of the seven syncopal episodes and that it entered the lungs between 8:15 p.m. and 8:30 p.m., when Darci complained of shortness of breath and chest pain.

¶ 92    Dr. Hall opined that Darci would have died regardless of the medical treatment provided by Dr. Shenfeld, given the age and size of the clot when she arrived at the hospital. He explained that anticoagulants "work better on fresh clot[s]" than older ones. Even if heparin or tPA had been given earlier, they would not have been able to save Darci. Dr. Hall believed that nothing Dr. Shenfield did or failed to do cause Darci's death.

¶ 93    *Dr. Geoff Crabb*

¶ 94    Dr. Geoff Crabb testified as Advocate's expert in emergency medicine. He explained that there are many possible causes for syncope, including "simple things" like being excited. Dr. Crabb opined that Dr. Shenfeld complied with the standard of care with respect to his initial

differential diagnosis. He agreed that Darci showed signs of dehydration and "there was nothing that would go along with a pulmonary embolism" when she arrived in the emergency room. He noted that, on arrival, Darci had no chest pain or shortness of breath, and her oxygen saturation level was 96%.

¶ 95    Dr. Crabb explained that the differential diagnosis evolved at 8:15 p.m., when Darci complained of shortness of breath and chest pain. Dr. Shenfeld complied with the standard of care at that point by changing his differential diagnosis to consider pulmonary embolism and by ordering a CTA. Dr. Crabb did not think the standard of care required an emergency physician to be able to conduct a POCUS, and he opined that no POCUS was warranted when Darci first arrived at the emergency room. As Darci showed no indication of pulmonary embolism before 8:15 p.m., the standard of care did not require heparin or tPA to be given earlier. Nor did he believe that the standard of care required Dr. Shenfeld to contact Dr. Kutty prior to 9:37 p.m.

¶ 96                    *Julianne Brennan, RN*

¶ 97    Advocate called Julianne Brennan, RN, as an emergency room nursing expert. Nurse Brennan testified that she believed Nurse Spaid appropriately communicated with Dr. Shenfeld and complied with the nursing standard of care.

¶ 98                     *Dr. Jess Mandel*

¶ 99    Dr. Jess Mandel testified as Advocate's expert in critical care medicine. Dr. Mandel disagreed with Dr. Salzman's theory that there were multiple clots causing the syncopal episodes. In his view, the autopsy indicated one large clot that blocked both main pulmonary arteries. Dr. Mandel opined that Darci suffered a very rare "clot-in-transit." He believed that the same clot was developing for a number of weeks before Darci's death.

- 18 -

¶ 100    Dr. Mendel testified that syncope is not a common symptom of pulmonary embolism. He opined that when Darci arrived at the emergency room, her presentation did not suggest pulmonary embolism and that she was not "critically ill" when Dr. Shenfeld first saw her. He believed she was hemodynamically stable before 8:15 p.m., when she experienced chest pain and shortness of breath.

¶ 101    Dr. Mandel believed that it was unlikely that Darci's clot-in-transit would show up on a POCUS. He also opined that any POCUS done before 8 p.m. would not have shown right heart strain. Elsewhere, Dr. Mandel expressed his view that heparin would not have been helpful in this case. Heparin is used to stop new clots from forming, but Darci had a "weeks-old" clot. He also did not think tPA would have saved Darci's life had it been given earlier.

¶ 102                                *Jury Instructions*

¶ 103    The jury instructions specified that plaintiff alleged that Dr. Shenfeld deviated from the standard of care in the following three ways: (1) "Failed to timely include PE within his differential diagnosis," (2) "Failed to timely perform and/or request POCUS and failed to timely request consultation with critical care/pulmonologist," and (3) "Failed to timely order and initiate Heparin and/or TpA [*sic*]."

¶ 104    The same instruction explained that plaintiff sought to hold Advocate liable "by and through" Dr. Shenfeld for the same three alleged deviations.

¶ 105    In addition, the same instruction specified plaintiff's claim that Advocate was liable for Nurse Spaid's alleged failure to communicate certain information to Dr. Shenfeld, namely: the "pre-arrival drop in oxygen saturation to 88%," the "pre-arrival syncopal episodes in the ambulance," the "3 syncopal episodes in the ambulance," and "the drop in oxygen saturations to 89% at 8:00 p.m."

¶ 106      Separately, the trial court denied defendants' request to tender Illinois Pattern Jury Instructions, Civil, No. 12.05 (withdrawn Aug. 2021) (hereinafter IPI Civil No. 12.05), which states in part that "if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant[s], then your verdict should be for the defendant[s]." However, the jury was instructed on proximate cause pursuant to Illinois Pattern Jury Instructions, Civil, No. 15.01 (revised Aug. 2021) (hereinafter IPI Civil No. 15.01), including that:

> "If you decide that the defendants were negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that something or someone else may also have been a cause of the injury. However, if you decide that the defendant[s'] conduct was not a proximate cause of the plaintiff's injury, then your verdict should be for the defendant[s]."

¶ 107                                           *Verdict*

¶ 108      After deliberations, the jury returned a verdict finding both Dr. Shenfeld and Advocate liable. The jury awarded itemized damages totaling $25 million. This amount included $3.5 million for "Grief and sorrow of [plaintiff] Michael White" and $5 million for plaintiff's "loss of society." The verdict also included identical amounts for Ryan's "grief and sorrow" and for Ryan's "loss of society."

¶ 109                                    Posttrial Motions

¶ 110      Dr. Shenfeld filed a posttrial motion, seeking judgment notwithstanding the verdict (JNOV) on the ground that plaintiff did not meet her burden of proof. In the alternative, Dr. Shenfeld sought a new trial on the grounds that the verdict was against the manifest weight of the evidence, that the court erred in admitting certain testimony, and the court erred in barring

- 20 -

evidence of plaintiff's subsequent romantic relationship. Dr. Shenfeld additionally argued that the court erred in failing to instruct the jury with IPI Civil No. 12.05. Dr. Shenfeld also sought a new trial on the basis that the verdict was excessive, and he also objected to plaintiff's request for prejudgment interest.

¶ 111    In its separate posttrial motion, Advocate sought JNOV on the grounds that plaintiff failed to prove that Darci's "massive pulmonary embolism could have been diagnosed and treated in sufficient time" or to prove that Nurse Spaid's alleged negligence in communications to Dr. Shenfeld "would have changed the outcome." Advocate alternatively argued for a new trial on grounds similar to those urged by Dr. Shenfeld. Advocate otherwise sought remittitur of the verdict as excessive, and it objected to prejudgment interest due to plaintiff's alleged abuse of the discovery process.

¶ 112    The court denied both posttrial motions in all respects. Pursuant to section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)), the court awarded prejudgment interest at 6% per annum, totaling more than $3 million.

¶ 113    Dr. Shenfeld and Infinity Healthcare Physicians, S.C., filed a notice of appeal (no. 1-24-0450). Advocate filed a separate appeal (no. 1-24-051), and the appeals were subsequently consolidated.

¶ 114    Dr. Shenfeld and Advocate filed separate briefs with overlapping arguments. Dr. Shenfeld's brief expressly adopts Advocate's argument, and conversely Advocate's brief also expressly adopts Dr. Shenfeld's brief.

¶ 115                                              ANALYSIS

¶ 116    On appeal, defendants primarily argue that they were entitled to a directed verdict or JNOV. In the alternative, they claim are entitled to a new trial because the verdict was against the

manifest weight of the evidence or because the court erred in certain evidentiary rulings and with respect to jury instructions. In addition, they challenge the verdict as excessive. Finally, defendants oppose the award of prejudgment interest.

¶ 117     For the following reasons, we find these arguments are without merit.

¶ 118                    Defendants Were Not Entitled to Directed Verdict or JNOV

¶ 119     Assuming *arguendo* that defendants were entitled to a directed verdict or JNOV, there would be no need to address their other claims. Thus, we first address defendants' claims that the court erred in declining to either grant their motion for directed verdict at the end of plaintiff's case, or in declining to enter JNOV following trial.

¶ 120     Both Dr. Shenfeld and Advocate urge that plaintiffs' expert testimony was speculative and insufficient to establish Dr. Shenfeld's alleged deviations from the standard of care or that any such deviation was a proximate cause of Darci's death. Advocate additionally argues that plaintiff failed to prove that Nurse Spaid deviated from the standard of care or proximate causation from such negligence.

¶ 121     A directed verdict or a JNOV should be entered only in those "limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses ***." *Id.* "[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Id.* at 452-53. "The court has no right to enter a judgment *n.o.v.* if there is any

- 22 -

evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* at 454.

¶ 122    We note the plaintiff's burden of proof in a medical malpractice case. "A plaintiff must present at least some evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements: the proper standard of care against which the defendant physician's conduct is measured, an unskilled or negligent failure to comply with the applicable standard, and a resulting injury proximately caused by the physician's want of skill or care. *Id.* at 112. Unless the medical professional's negligence is "grossly apparent" or the treatment at issue is within the common knowledge of a layperson, "expert medical testimony is required to establish the applicable standard of care and the medical professional's deviation therefrom." *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 60. Similarly, the element of proximate causation "must be established by expert testimony to a reasonable degree of medical certainty. [Citation.]" *Susnis v. Radfar*, 317 Ill. App. 3d 817, 826-27 (2000). "The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible." *Id.* at 827. While testimony based on known facts is proper, "conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant." *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 293 (2008).

¶ 123    "A motion for a judgment *n.o.v.* presents a question of law as to whether there was a complete failure to substantiate a key element of the plaintiff's case," and the trial court's

ruling is subject to *de novo* review. *Gulino*, 2015 IL App (1st) 131587, ¶ 59. Here, we agree with the trial court that defendants were not entitled to either a directed verdict or JNOV.

¶ 124                    Plaintiff Offered Sufficient Expert Testimony Regarding Dr. Shenfeld's

Alleged Negligence and Proximate Causation

¶ 125        In seeking JNOV, defendants suggest there was insufficient expert testimony linking Darci's death to any of Dr. Shenfeld's three alleged deviations from the standard of care: (1) failure to timely include pulmonary embolism in his differential diagnosis, (2) failure to timely perform or request a POCUS, and (3) failure to timely initiate treatment with heparin or tPA. We disagree. Plaintiff (through multiple experts) presented nonspeculative testimony linking these alleged deviations to plaintiff's injury.

¶ 126        Specifically, Dr. Moore testified that Dr. Shenfeld should have initially considered pulmonary embolism in the differential diagnosis, given Darci's "hemodynamic instability, syncope, and hypoxia." Dr. Moore explicitly testified that if pulmonary embolism been considered earlier or POCUS performed earlier, then therapy including heparin "could and should have been initiated sooner" and that this "would more likely than not have prevented her from dying."

¶ 127        Dr. Kline gave similar expert testimony linking Dr. Shenfeld's alleged failures to Darci's death. His testimony indicated that earlier consideration of pulmonary embolism would have led to an earlier POCUS and earlier use of heparin. Dr. Kline testified that Dr. Shenfeld should have considered pulmonary embolism as the "number one or number two" possibility when he first encountered Darci. Dr. Kline further testified that an earlier POCUS would have shown right heart strain, which in turn would have prompted the use of heparin "right away." Another

of plaintiff's experts, Dr. Salzman, testified that if a POCUS was performed earlier, it would show that the right ventricle was larger than normal.

¶ 128    Notably, defendants do not dispute that plaintiff's experts were qualified to render opinions on the applicable standard of care. And while the defense experts obviously disagreed with their conclusions, we cannot say that plaintiffs' experts lacked any factual basis or that their testimony was unduly speculative. We emphasize that it is not our role to usurp the jury's function in assigning weight or credibility to conflicting experts. See *Maple*, 151 Ill. 2d at 452-53 ("[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way."). A JNOV is improper "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* at 454.

¶ 129    In short, plaintiff presented nonspeculative expert testimony to a reasonable degree of medical certainty that (1) Dr. Shenfeld deviated from the standard of care and (2) that such deviations proximately caused Darci's death. Although defendants presented conflicting expert testimony, there was clearly a substantial factual dispute and issues of credibility for the jury to resolve. Thus, defendants were not entitled to JNOV with respect to Dr. Shenfeld's alleged negligence.

¶ 130                    Advocate Is Not Entitled to JNOV With Respect to Nurse Spaid

¶ 131    Separate from the allegations about Dr. Shenfeld's conduct, we recognize Advocate's additional argument that it was entitled to JNOV because plaintiff did not prove that Nurse Spaid negligently failed to communicate certain information to Dr. Shenfeld. That is, Advocate

contends there was no nonspeculative evidence that Nurse Spaid deviated from the standard of care, or how her alleged failure to communicate proximately caused injury.

¶ 132    Importantly, however, the jury was instructed that it could find Advocate liable based on *either* negligence by Dr. Shenfeld or by Nurse Spaid. As plaintiff points out, the verdict form with respect to Advocate simply asked whether it found Advocate liable; there was no special interrogatory asking the jury whether it found negligence on the part of Dr. Shenfeld, Nurse Spaid, or both. Thus, this situation implicates the "two issue rule," by which a general plaintiff's verdict "without special interrogatories will not be disturbed if the case involved two or more determinative issues, or two or more theories were presented, and there was sufficient evidence to support at least one of the issues or theories that was free from prejudicial error." *Perez v. St. Alexius Medical Center*, 2022 IL App (1st) 181887, ¶ 64. In other words, "a general verdict creates a presumption that the jury found in favor of the victorious party on every claim, theory, or defense raised." *Id.* Insofar as the jury returned a general verdict holding Advocate liable, there is a presumption it did so based on allegations regarding both Nurse Spaid and Dr. Shenfeld.

¶ 133    Moreover, insofar as the jury separately found Dr. Shenfeld liable, it is clear that the jury did find that Dr. Shenfeld was negligent. As plaintiff presented sufficient expert testimony regarding Dr. Shenfeld's alleged deviations, Advocate could be held liable based solely on Dr. Shenfeld's conduct. Thus, even assuming *arguendo* that there was no evidence of negligence by Nurse Spaid, it would not require entry of JNOV in Advocate's favor. In turn, we need not delve into the evidence regarding Nurse Spaid's conduct in order to conclude that Advocate was not entitled to JNOV.

¶ 134    The Verdict Was Not Against the Manifest Weight of the Evidence

¶ 135    Having concluded that defendants were not entitled to a JNOV, we turn to their various stated reasons for seeking reversal and a new trial. They primarily assert that the jury verdict was against the manifest weight of the evidence.

¶ 136    In his brief, Dr. Shenfeld argues the evidence could not support a finding that he failed to timely include pulmonary embolism in his differential diagnosis for Darci. He claims there is "undisputed evidence" that he only knew about one episode of syncope when she first arrived and that she only became "hemodynamically unstable" after 8 p.m., when he ordered a CTA to rule out pulmonary embolism. He points out it is undisputed that Darci did not complain of shortness of breath or chest pain until approximately 8:15 p.m.

¶ 137    Dr. Shenfeld also argues that plaintiff's emergency medicine experts, Drs. Moore and Kline, "backed off the opinion [that] the standard of care required Dr. Shenfeld to perform a POCUS," such that the jury verdict could not be based on that alleged failure. Dr. Shenfeld also asserts that his alleged failure to timely order heparin or tPA could not form the basis for a verdict against him, citing Dr. Salzman's testimony that heparin would not dissolve a preexisting clot.

¶ 138    "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967, ¶ 28. In deciding this inquiry, the court "may not simply reweigh the evidence" and substitute its judgment for that of the jury. *Id.* With this standard in mind, we reject defendants' manifest weight of the evidence challenge. Even if this court might have weighed the evidence differently, we cannot say the jury's conclusions were arbitrary or that the opposite conclusion is clearly evident.

¶ 139    As to Dr. Shenfeld's first point, we agree with plaintiff that whether Dr. Shenfeld knew of additional syncopal episodes was a question of fact for the jury. In this regard, we recognize that there was a discrepancy between the audio recording of the call from the paramedics to the ECRN nurse (Nelson)—which referenced multiple syncopal episodes—and the written medical records, which only reflected a single episode. Nonetheless, there was some evidence from which the jury might reasonably infer that such information from the paramedics was communicated to Dr. Shenfeld. Specifically, Nurse Nelson testified that it was her practice to communicate all information from the paramedics to Nurse Spaid, and Nurse Spaid testified she would have given all such information to Dr. Shenfeld.

¶ 140    In any event, plaintiff's experts' opinion that Dr. Shenfeld should have initially considered pulmonary embolism did not necessarily depend on Dr. Shenfeld having knowledge of *multiple* syncopal episodes. For instance, Dr. Moore's testimony indicated Dr. Shenfeld should have considered pulmonary embolism "early" due to "hemodynamic instability, syncope, and hypoxia." There is no dispute that Darci presented with at least one episode of syncope. And there was conflicting expert testimony about whether Darci was "hemodynamically unstable" when she arrived at the emergency room. In this regard, there was at least some evidence from which the jury could infer that it was communicated to Dr. Shenfeld that Darci's oxygen level had dipped to 88%, requiring supplemental oxygen before she arrived. Although that specific reading was apparently not recorded in writing, the paramedic testified that his practice would have been to communicate such information to the ECRN (Nelson), and Nelson similarly testified that she would have passed such information on to the treating nurse (Spaid).

¶ 141    We also are not persuaded by defendants' claim that plaintiff's experts "backed off" their opinion that Dr. Shenfeld should have performed a POCUS earlier. Defendants cite a portion

of Dr. Moore's cross-examination where he agreed that a "POCUS doesn't *always* have to be done when considering [pulmonary embolism]" and Dr. Kline's similar concession that "the standard of care would not require *** a POCUS, *for everyone* with suspicion of a pulmonary embolism who walked into an emergency department." (Emphases added). Despite agreeing that a POCUS is not necessary in all cases, plaintiffs' experts could maintain their opinion that in Darci's particular case, Dr. Shenfeld should have requested one earlier. The jury was entitled to credit such expert opinion.

¶ 142          Defendants also claim that the jury could not reasonably find Dr. Shenfeld negligent for failing to give her heparin or tPA. In doing so, they cite portions of testimony in which Dr. Salzman agreed that heparin would not break up a clot that had already formed. However, plaintiff correctly points out that whereas defense experts opined that Darci died from a single massive clot, plaintiffs' experts' theory of the case was that Darci suffered a series of "showering" clots, evidenced by multiple syncopal episodes. And Dr. Salzman specifically stated that Darci would have survived if heparin had been administered. Moreover, Dr. Salzman testified that tPA begins to "start breaking up a clot" as soon as it is administered, and that Darci could have survived if it had been given.

¶ 143          In light of this, we cannot say the verdict was against the manifest weight of the evidence. To be clear, at issue is not whether this court would have reached the same factual conclusions. This was a classic "battle of the experts" in which medical professionals offered very different theories based on the same factual record. Certainly, a different jury might have well been convinced by defendant's experts and reached a different verdict. But that is not the applicable standard of upon "manifest weight of the evidence" review. Here, given the conflicting expert testimony, we cannot say the opposite conclusion is clearly evident or the findings of the jury

are unreasonable, arbitrary, and not based upon any of the evidence. Thus, we reject defendants' request for reversal on this basis.

¶ 144    The Court Did Not Abuse Its Discretion in Allowing Cumulative Expert Testimony

¶ 145    We turn to the defendant's claims that evidentiary errors require reversal. Generally, this court reviews evidentiary rulings for an abuse of discretion. *Hoffman v. Northeast Illinois Regional Commuter R.R. Corp.*, 2017 IL App (1st) 170537, ¶ 41. An abuse of discretion occurs "only when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person" would take the trial court's view. *Id.* Importantly, erroneous rulings necessitate reversal only where the error is "substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.) *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39.

¶ 146    We first address defendants' claim that the court erred in repeatedly denying their request to bar "identical" expert testimony from Drs. Moore and Kline about the applicable standard of care for emergency room doctors. They point out that— although the trial court warned plaintiff that these experts should not "parrot each other"—both Drs. Moore and Kline indicated that Dr. Shenfeld negligently failed to consider pulmonary embolism earlier, failed to conduct a POCUS, and failed to administer heparin. Defendants suggest they were prejudiced because allowing Dr. Moore's and Dr. Kline's testimony (along with that of Dr. Salzman) allowed plaintiff to suggest to the jury that it should find in his favor, merely because he had more testifying experts than defendants.

¶ 147    Although we recognize that Dr. Moore's and Dr. Kline's testimony did overlap in some respects, we cannot say that it was an abuse of discretion to allow Dr. Kline to testify after Dr. Moore. We note that Dr. Kline's testimony differed somewhat, in that he focused more on the

pathology of DVT and pulmonary embolism. In assessing whether the trial court's decision was reasonable, we think it significant that the *defendants* offered largely overlapping standard of care testimony from multiple experts. Dr. Shenfeld and Advocate separately called emergency medicine experts (Dr. Cichon and Dr. Crabb), each of whom testified that Dr. Shenfeld met the applicable standard of care. Under these circumstances, we cannot say it was unreasonable for the trial court to permit both Dr. Moore and Dr. Kline.

¶ 148　　　　More importantly, even assuming Dr. Kline's testimony was unduly cumulative, we cannot say it caused such prejudice as to warrant reversal. See *id.* (when erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless). The record does not persuade us that the jury's verdict was unduly impacted because it heard cumulative testimony from multiple plaintiff's experts. We again note that the jury also heard largely overlapping testimony from multiple defense experts. Thus, even if it was erroneous, the admission of cumulative expert testimony was harmless and does not warrant reversal.

¶ 149　　　　　　The Court Did Not Abuse Discretion in Admitting POCUS Testimony

¶ 150　　　　Defendants alternatively contend that the court abused its discretion in allowing any expert testimony that the standard of care required Dr. Shenfeld to perform a POCUS. In support, defendants repeat their claim that Drs. Moore and Kline "backed off their testimony with respect to a POCUS," citing portions of their cross-examinations in which they conceded that a POCUS need not always be performed for every patient. In turn, defendants argue, plaintiff should not have been allowed to elicit Dr. Salzman's testimony that Darci would have survived if a POCUS had been performed before 8:30 p.m.

¶ 151    We reject this argument. First, as already noted, the transcript does not show that Dr. Moore or Dr. Kline "backed off" their opinion that a POCUS should have been performed in this particular case. They merely conceded that a POCUS is not necessary in all cases. Their testimony did not preclude Dr. Salzman's subsequent testimony regarding the need for a POCUS.

¶ 152    In any event, we note that the jury's general verdict was not necessarily premised on a finding that a POCUS should have been performed earlier, as this was only one of the three ways in which Dr. Shenfeld allegedly deviated from the standard of care. The jury could have reached the same verdict based on either or both of the other two alleged deviations. In turn, defendants could not establish prejudice to warrant reversal on this basis.

¶ 153       The Court Did Not Err in Allowing Dr. Salzman's Testimony Regarding tPA

¶ 154    Defendants separately contend that they are entitled to a new trial because the court abused its discretion in allowing Dr. Salzman to testify that tPA could have prevented Darci's death. They argue that "since neither Dr. Moore nor Dr. Kline believed the standard of care required a POCUS" and "since the decision to prescribe tPA was contingent upon the result of a POCUS," plaintiff failed to prove that Dr. Shenfeld deviated by failing to give tPA. We reject this line of argument, since (as already noted) it misconstrued Dr. Moore's and Dr. Kline's testimony regarding the need for a POCUS in Darci's case.

¶ 155    Defendants otherwise argue that because "Dr. Salzman could not say when Darci's clot started," and he agreed that tPA is a "clot buster" drug, "no expert could establish when tPA would been effective." They suggest that the jury was left to "speculate about when a clot formed and whether tPA would have made a difference." This claim is without merit, as it

ignores plaintiffs' expert testimony that Darci suffered multiple clots, corresponding to her multiple syncopal episodes.

¶ 156        Defendants otherwise suggest that the trial court should have barred Dr. Salzman's "conclusory" opinion that tPA would have prevented Darci's death because other testimony indicated tPA could not have been given in time to save her. Defendants cite testimony indicating that (1) tPA should not be given until a pulmonary embolism is confirmed, (2) Darci "had no signs or symptoms of a PE until 8:15," and (3) the results of a confirmatory test would not have been available until 9:15 p.m., by which time Darci was already in cardiac arrest.

¶ 157        This argument is without merit because it ignores plaintiff's expert testimony that Darci was, in fact, showing signs of pulmonary embolism when she first arrived at the emergency department. We note that such arguments—while couched as attacks on the admissibility of expert testimony— are essentially attacks on the *weight* of the expert opinions, which was for the jury to resolve. Defendants do not claim that any of plaintiff's experts were unqualified to render their opinions. Defendants had full opportunity to offer their own conflicting experts, and defense counsel had full opportunity to cross-examine plaintiffs' experts on the bases for their opinions. Although defendants obviously disagree with how the jury weighed the conflicting opinion, that does not mean the trial court abused its discretion in permitting the jury to hear plaintiff's theory of the case. In short, we reject the suggestion that the trial court abused its discretion in permitting plaintiff's expert to opine that tPA could have prevented Darci's passing.

¶ 158        The Court Did Not Err in Barring Reference to Plaintiff's Subsequent Relationship

¶ 159        We turn to the claim that defendants are entitled to a new trial due to the trial court's rulings, both before and during trial, barring reference to plaintiff's romantic relationship with

Markowski in the years after Darci's death. There is no dispute that plaintiff and Markowski cohabited but were not married.

¶ 160    Defendants argue that such evidence was relevant to damages recoverable by plaintiff for his "grief and sorrow" (for which the jury awarded $3.5 million) and "loss of society," for which the jury awarded another $5 million. They urge that the jury should have been given an opportunity to assess "the value of [plaintiff's] relationship" with Markowski in weighing such damages. Defendants suggest that if the jury had been told that plaintiff has enjoyed a subsequent relationship for several years, it "would have significantly affected its award." Instead, they urge the jury was "left with the false impression [plaintiff] has been alone, without any female companionship" since Darci's death. They note plaintiff's trial testimony that, after her death, he told his son that "it's just going to be the two of us."

¶ 161    Defendants acknowledge that plaintiff did not remarry. Yet, they argue that relevance of a subsequent relationship to loss of consortium damages should not depend on whether the plaintiff has remarried after the death of a spouse. They urge that any such rule "should be abolished as anachronistic and illogical." That is, defendants argue the court erred by preventing the jury from being able to consider plaintiff's "committed, happy-cohabitation" with a new romantic partner in assessing loss of consortium damages.

¶ 162    In urging that we affirm, plaintiff suggests that as a matter of Illinois law, evidence of any subsequent relationship (other than remarriage) was irrelevant and inadmissible to loss of consortium. That is, plaintiff implies the court had no discretion to admit such evidence.

¶ 163    We disagree with plaintiff, insofar as he suggests that Illinois law bars admission of such evidence under any circumstances. Rather, we conclude that the decision to admit or preclude such evidence is a matter within the trial court's discretion. However, because we cannot say

the trial court abused its discretion in the instant case, we reject defendants' claim of error on this point.

¶ 164     As to the standard of review, we reiterate that evidentiary rulings are reviewed for an abuse of discretion. *Hoffman*, 2017 IL App (1st) 170537, ¶ 41. That is, we will find error "only when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person" would take the trial court's view. *Id.* Erroneous rulings necessitate reversal only where the error is "substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.) *Jefferson*, 2018 IL App (1st) 162219, ¶ 39.

¶ 165     In urging that the trial court lacked discretion to admit evidence of a subsequent relationship, plaintiff points to decades-old case law holding that damages for loss of consortium terminate upon the surviving spouse's remarriage. See *Martin v. Illinois Central Gulf R.R.*, 237 Ill. App. 3d 910, 922 (1991) ("[R]ecovery for loss of consortium terminates upon the remarriage of the surviving spouse."); *Carter v. Chicago & Illinois Midland Ry. Co.*, 130 Ill. App. 3d 431, 436 (1985) ("[I]f loss of consortium is sought, it must be actual loss; that is, loss up to the time of remarriage."); see also *Simmons v. University of Chicago Hospitals & Clinics*, 162 Ill. 2d 1, 15 (1994) (acknowledging "that appellate decisions have held that evidence of a subsequent remarriage is relevant in loss of spousal consortium claims").

¶ 166     Plaintiff suggests *Martin* shows that cohabitation with a new unmarried partner is not relevant as a matter of law. However, a close reading of *Martin* shows it declined to make any such rule but simply affirmed the trial court's exercise of discretion on this evidentiary question.

¶ 167     The *Martin* plaintiff obtained a verdict against a railroad after her husband was killed by a train. *Martin*, 237 Ill. App. 3d at 913. On appeal, the railroad argued the court erred in not

permitting it to "show that plaintiff cohabited with another man on and off for a period of approximately three years before she married him," and that "plaintiff should not be entitled to recover for loss of consortium during the time she was living with another man." *Id.* at 922.

¶ 168    In the course of affirming, our court stated: "It is well settled that recovery for loss of consortium terminates upon the remarriage of the surviving spouse." *Id.* (citing *Carter*, 130 Ill. App. 3d 431, and *Dotson v. Sears, Roebuck & Co.*, 157 Ill. App. 3d 1036 (1987)). However, the *Martin* court explicitly declined to address whether this principle "should be extended to a surviving spouse who enters into a personal relationship with another person but who is not married to that person." *Id.* Rather, it simply held that trial court "did not err in limiting defendant's evidence on damages." *Id.* Thus, *Martin* simply indicated that it found no abuse of discretion in barring the evidence of cohabitation.

¶ 169    The parties do not identify any subsequent decision of this court or our supreme court holding that, as a matter of law, evidence of a plaintiff's subsequent relationship (other than remarriage) is inadmissible to limit potential recovery for loss of consortium. In turn, we think that (as with any other evidence), the decision as to its relevance and admissibility is subject to the well-settled general rule that "[t]he relevance of evidence is a matter within the sound discretion of the trial court and a reviewing court will not disturb the trial court's determination absent an abuse of discretion." *The Northern League of Professional Baseball Teams v. Gozdecki, Del Giudice, Americus & Farkas, LLP*, 2018 IL App (1st) 172407, ¶ 30.

¶ 170    In this regard, we note our supreme court's recent decision in *Passafiume v. Jurak*, 2024 IL 129761, declined to disturb existing precedent regarding loss of consortium. The *Passafiume* plaintiff (who had since remarried) brought medical negligence claims against defendants in connection to the death of his wife. In the trial court, plaintiff "agreed that

damages for loss of consortium terminate upon a party's remarriage" but contended that his damages for "loss of material services" were distinct from and not limited by his remarriage. *Id.* ¶ 5. The trial court agreed and permitted expert testimony concerning the value of plaintiff's loss of material services beyond the date of his remarriage. *Id.* ¶ 6.

¶ 171  Our supreme court in *Passafiume* addressed whether in a Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2014)) action, a plaintiff may be awarded damage for loss of material services beyond the date of remarriage. *Passafiume*, 2024 IL 129761, ¶ 1. Our supreme court held that a plaintiff's "remarriage, or the possibility thereof, does not affect the damages recoverable for the wrongful death of the decedent." *Id.* ¶ 51.

¶ 172  Significantly, our supreme court's analysis acknowledged that "This court has never addressed *Carter*'s holding that damages for loss of consortium in wrongful death cases can be recovered only up to the time of a plaintiff's remarriage ***." *Id.* ¶ 52. Further, our supreme court explicitly declined an *amicus* party's request to address "the validity of the *Carter* rule" limiting loss of consortium damages upon remarriage. *Id.* ¶¶ 52-53.

¶ 173  In sum, there appears to be no Illinois precedent since *Martin* directly addressing the admissibility of a surviving spouse's subsequent relationship in relation to a loss of consortium claim. However, in concluding that this was a matter for the court's discretion, we find persuasive our supreme court's decision in *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150 (1995). In *Holston*, defendant appealed from a $7.3 million dollar verdict related to medical care provided to plaintiffs' decedent, including damages for the surviving husband's wrongful death claim. Among other claims of error, the defendant argued that "on the issue of loss of consortium, the court should have admitted evidence that the decedent had been

separated from her husband for a period of four months, although the separation had ended approximately 1½ years before her death." *Id.* at 154.

¶ 174       In affirming the trial court's ruling to exclude such evidence, our supreme court explained that the trial judge "was in the best position to evaluate the relevance of the evidence" regarding the marital relationship and "[c]ourts retain broad discretion in making evidentiary rulings at trial and therefore may properly exclude evidence of limited probative value." *Id.* at 176. In finding "no abuse of discretion in the trial court's ruling," the *Holston* court also cited two cases indicating that admissibility of evidence of marital conduct is subject to the court's discretion as to its relevance to a consortium claim. *Id.* at 176-77 (citing *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458, 468 (1987) (affirming wrongful death award where "[t]he asserted misbehavior of decedent was not shown to have affected his familial relationships" and "the prejudicial effect of the information sought to be introduced far outweighed any valid evidentiary inferences"), and *Countryman v. County of Winnebago*, 135 Ill. App. 3d 384, 388-90 (1985) (holding that evidence of decedent's marital infidelity was relevant and should have been admitted to demonstrate diminishment in the value of consortium claim)).

¶ 175       We recognize that *Holston* and cases cited therein are not directly on point, insofar as they did not discuss evidence of a surviving spouse's relationship after the decedent's death. Nonetheless, they support the general proposition that the trial court is vested with discretion to admit evidence it deems relevant to a claim for consortium damages. These cases provide a useful analogy for why evidence of cohabitation or a longstanding relationship may be relevant to a jury's assessment of the value of a claim for loss of consortium. To be clear, we decline plaintiff's invitation to endorse a bright-line rule that such evidence is inadmissible. However,

that does not mean that the evidentiary ruling in this particular case was necessarily an abuse of discretion.

¶ 176     We thus find that the admission of the evidence at issue was a matter within the court's discretion. However, we also decline to find an abuse of discretion, as we cannot say the ruling was "arbitrary, fanciful, unreasonable," or that "no reasonable person" would take the trial court's view. *Hoffman*, 2017 IL App (1st) 170537, ¶ 41. In excluding the evidence of plaintiff's new relationship, the court apparently determined that its probative value was outweighed by prejudicial effect or jury confusion. See Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ***.").

¶ 177     Although this court might have reached a different conclusion had it been in the trial judge's position, we cannot say that the decision to exclude the evidence was so unreasonable as to be an abuse of discretion. The trial court could have been legitimately concerned about problematic effects of such evidence, notwithstanding any probative value as to loss of consortium. Among other reasons, the trial court could reasonably determine that evidence that plaintiff began a new relationship after Darci's death would unfairly prejudice the jury against plaintiff or that it might otherwise distract the jury's attention from the core factual disputes in the case—namely, proof of the alleged negligence and causation. Thus, we find no error in the trial court's decision to bar evidence of plaintiff's subsequent relationship, as it pertains to loss of consortium.

¶ 178     To be clear, we are simply finding that this evidentiary ruling was a matter of the trial court's discretion, which was not abused in this case. However, we note that the defendants make a valid point, insofar as they suggest that this issue should be freshly examined in light

of current social views. There can be no doubt that societal attitudes about marriage and cohabiting relationships have changed significantly in the decades since *Martin* was decided. Many people no longer view the legal status of marriage as necessary to signify that a couple is in a serious committed relationship, especially if the couple is cohabiting. It is certainly plausible that a jury in a given case might consider a plaintiff's subsequent relationship relevant in assessing loss of consortium damages, regardless of whether the plaintiff has remarried.

¶ 179    Moreover, there is some appeal to defendants' argument that their position aligns with the principle that decisions about marriage should be based on love, not money. Following briefing, we allowed plaintiff's motion for leave to cite as additional authority *Sostock v. Reiss*, 92 Ill. App. 3d 200 (1980), in which plaintiffs were a couple who sought loss of consortium damages based upon personal injuries that the wife suffered while they were engaged but not yet married. *Id.* at 201. This court affirmed dismissal, reasoning that because no legal relationship existed between the couple at the time of the wife's injury, the husband "lost no rights for which he could claim compensation." *Id.* at 206. Notably, the *Sostock* court rejected plaintiff's argument that denying his right to recover was contrary to public policy in favor of marriage, because it "would encourage a fiance to refuse to marry his intended spouse." *Id.* at 207. The court disagreed, noting: "A decision to marry should be based on mutual love, affection and respect, not on a mercenary motive." *Id.*

¶ 180    *Sostock* is plainly distinguishable from the evidentiary question here. Nevertheless, insofar as *Sostock* commented that marriage should not be based on a monetary motive, there is some logic to Dr. Shenfeld's argument that the trial court's ruling actually "discourages marriage since it precludes remarried individuals from recovering for loss of consortium damages while allowing cohabiting individuals to accomplish a full, unmitigated recovery." It would not make

sense to endorse a rule that completely bars loss of consortium recovery by remarried surviving spouses, incentivizing a surviving spouse *not to* remarry in order to preserve a larger loss of consortium award. However, we do not purport to make any rule or decide any such policy questions in this opinion. We simply conclude that the trial court did not abuse its discretion in excluding the evidence at issue under the record in this particular case.

¶ 181    Defendants otherwise argue that evidence of plaintiff's subsequent relationship should independently have been admitted for impeachment purposes. They suggest that plaintiff "opened the door" to such evidence when he testified that his life was different after Darci's death, and when he testified about telling his son that it was "just going to be the two of us."

¶ 182    Whether to admit evidence for impeachment purposes is subject to an abuse of discretion standard. *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 748 (2001). "To be used for impeachment, a witness' prior statement must be materially inconsistent with his or her trial testimony." *Id.*

¶ 183    We reject defendants' impeachment argument for a simple reason: evidence of plaintiff's subsequent relationship would not contradict or be inconsistent with the cited portions of his trial testimony. Plaintiff's subsequent relationship with Markowski does not contradict or undermine plaintiff's statement that his life was "one hundred percent" different after Darci's death. Certainly, plaintiff could feel that his life was completely different after the death of his wife (the mother of his child), regardless of any subsequent relationships. Evidence of the subsequent relationship also would not impeach plaintiff's testimony that, in the hospital on the night of Darci's death, he told his son that it was going to be "the two of us." At that point, the family was, in fact, just plaintiff and his son.

¶ 184    We also note that, even assuming *arguendo* it was error to exclude such evidence, we would not find resulting prejudice warranting reversal. See *North Spaulding Condominium*

*Ass'n v. Cavanaugh*, 2017 IL App (1st) 160870, ¶ 30 (error in an evidentiary ruling is not grounds for reversal unless it is "substantially prejudicial and affected the outcome of the case"). In this regard, we note that the jury gave identical awards of $5 million each to Ryan and plaintiff for loss of society, which is broader than loss of spousal consortium. This suggests the jury did not give significant weight to the husband's loss of consortium; otherwise plaintiff's award would have been higher than his son's. Thus, we cannot say that any error regarding evidence of the subsequent relationship caused substantial prejudice.

¶ 185                    Allegedly Improper Testimony About Medical Documentation

¶ 186          We briefly address Advocate's separate contention that that it was prejudiced and denied a fair trial because plaintiff elicited irrelevant testimony about medical documentation issues, in violation of a pretrial ruling. Advocate points out that the court granted its motion *in limine* seeking to bar any opinions or testimony regarding "alleged documentation or charting deficiencies" or errors in medical documentation of Darci's care.

¶ 187          Advocate asserts that plaintiff's counsel violated this order during cross-examination of Nurse Spaid. Specifically, plaintiff elicited testimony from Nurse Spaid that after Darci's death, she "corrected" documentation to clarify that an oxygen saturation reading at 8 p.m. (when Darci was given supplemental oxygen) was 94%, when it originally stated that it was 89%. During Nurse Spaid's testimony, defense counsel objected and argued during a sidebar that plaintiff's counsel was insinuating "some kind of bad faith or nefarious reason" for the correction in the medical records. Nurse Spaid proceeded to testify that she did not recall making the correction, but it could have simply reflected that Darci's oxygen increased from 89% to 94% when she received supplemental oxygen. Advocate points out that in closing argument, plaintiff's counsel referenced Nurse Spaid's change and asked: "Why did she do

that?" Advocate urges that this improperly suggested to the jury that there was some nefarious purpose to the correction, which was wholly irrelevant to any allegation of negligence.

¶ 188    It does appear that plaintiff's references to Nurse Spaid's correction of the 8 p.m. oxygen reading violated the ruling on the referenced motion *in limine*. However, violation of a motion *in limine* is not *per se* reversible error. *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 34. Reversal is only warranted if the appellant was prejudiced or the error unduly affected the outcome. *Id.* Given the totality of the expansive trial record, we cannot conclude that the brief references to Nurse Spaid's correction actually resulted in any prejudice or affected the outcome of trial.

¶ 189    We similarly are unconvinced by Advocate's claim that plaintiff's counsel violated the same pretrial ruling during cross-examination of Dr. Shenfeld. Advocate points out that Dr. Shenfeld was asked if he knew whether information about Darci's "normal" blood pressure range had been inserted into the medical record after she went into cardiopulmonary arrest. Dr. Shenfeld answered that he did not know. Even assuming *arguendo* that this question violated the pretrial ruling on the motion *in limine*, Advocate does not articulate how it was prejudiced by this question, and we find no basis in the record to conclude that it was.

¶ 190    The Evidence Supported a "Sole Proximate Cause" Jury Instruction but Defendants

Do Not Show Prejudice Requiring Reversal

¶ 191    We turn to defendants' claim that the trial court erred in denying their request to instruct the jury with IPI Civil No. 12.05 regarding the concept of "sole proximate cause." That is, they sought a jury instruction that "if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant[s], then your verdict should be for the defendant[s]." *Id.*

¶ 192    Notably, the jury was otherwise instructed about proximate cause pursuant to IPI Civil No. 15.01 as follows:

"When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.

If you decide that the defendants were negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that something or someone else may also have been a cause of the injury. However, if you decide that the defendant's conduct was not a proximate cause of the plaintiff's injury, then your verdict should be for the defendant[s]."

¶ 193    Defendants acknowledge that the instruction they sought, IPI Civil No. 12.05, was withdrawn by the Illinois Supreme Court Committee on Jury Instructions in August 2021, in conjunction with a modification to IPI Civil No. 15.01. Significantly, the committee comment to IPI Civil No. 15.01 explains the relationship between the withdrawal of IPI Civil No. 12.05 and the modification to IPI Civil No. 15.01:

"The Committee again modified [IPI Civil No. 15.01] in 2021 with the intent of harmonizing the proximate cause instructions formerly found in IPI 12.04, 12.05, and 15.01 into one proximate cause instruction to avoid unnecessary confusion and consternation. *** The second paragraph in [modified IPI Civil No. 15.01] merges the concepts previously conveyed in IPI 12.04 and 12.05 and combines those concepts into one proximate cause instruction because 'Nomenclature aside, the sole proximate cause theory is simply one way a defendant argues that the plaintiff failed to carry its burden of proof

- 44 -

on proximate cause ***.' " IPI Civil No. 15.01, Committee Comment (rev. Oct. 2021) (quoting *Douglas v. Arlington Park Racecourse, LLC*, 2018 IL App (1st) 162962, ¶ 36).

¶ 194    Although the jury was instructed pursuant to IPI Civil No. 15.01, defendants maintain they were also entitled to the "sole proximate cause" instruction in IPI Civil No. 12.05, insofar as they elicited Dr. Hall and Dr. Mandel's testimony that Darci would have died from her pulmonary embolism, regardless of the treatment she received in the emergency room. That is, defendants urge that there was at least some evidence warranting an instruction that something other than the alleged negligence was the proximate cause of Darci's injury. They claim the omission of this instruction seriously prejudiced them, warranting reversal.

¶ 195    We note plaintiff's contention that this claim of error was forfeited, insofar as defendant "did not tell the trial court why" the jury needed IPI Civil No. 12.05 in addition to the instruction based on IPI Civil No. 15.01. Plaintiff cites the recent decision in *Abraham v. Advocate Health & Hospitals Corp.* 2025 IL App (1st) 241351-U, ¶ 119, in which defendants similarly argued that they were entitled to a "sole proximate cause instruction" in addition to a proximate cause instruction based on IPI Civil No. 15.01. In that decision, this court explained that "A party forfeits the right to object to jury instructions when the party fails to make a specific objection during the jury instruction conference." *Abraham*, 2025 IL App (1st) 241351-U, ¶ 115 (citing *Colella v. JMS Trucking Co. of Illinois, Inc.*, 403 Ill. App. 3d 82, 95 (2010)). In *Abraham*, this court found forfeiture where, although defendants offered a "boilerplate objection" to the proximate cause instruction based on IPI Civil No. 15.01, they did not specifically articulate to the trial court "that they were entitled under the evidence to the sole proximate cause language" they requested. *Abraham*, 2025 IL App (1st) 241351-U,

¶ 117. Apart from forfeiture, this court in *Abraham* proceeded to find the trial court did not err in refusing the requested sole proximate cause instruction. *Id.* ¶ 119.

¶ 196     We do not find forfeiture in this case. At the jury instruction conference, counsel for both Dr. Shenfeld and Advocate articulated their position that the evidence showed that Darci's "clot-in-transit" was the "sole proximate cause" for her injuries, warranting a separate instruction on that concept. That point was raised again in defendants' posttrial motions.

¶ 197     We thus proceed to decide the merits of this issue. Notably, following the briefing in this case, we allowed a motion to consider as additional authority *Johnson v. Advocate Health & Hospitals Corp.*, 2025 IL App (1st) 230087, a medical malpractice case alleging negligence surrounding the birth and delivery of plaintiff's child, who suffered neurodevelopmental deficits. *Johnson* likewise addressed whether the trial court erred by failing to instruct the jury on sole proximate cause. There, as in this case, plaintiffs maintained there was no error because "IPI Civil No. 15.01 was sufficient to instruct the jury on the issue." *Id.* ¶ 45.

¶ 198     *Johnson* found that the defendant hospital was entitled to a jury instruction on sole proximate cause, because it offered some evidence that the child's injuries were solely caused by a preexisting medical condition. *Id.* ¶ 60. However, this court found that this error did not cause serious prejudice to defendant and thus did not warrant reversal. See *id.* ¶¶ 64-72. We reach a similar conclusion here.

¶ 199     Generally, " '[l]itigants have the right to have the jury instructed on each theory supported by the evidence.' " *Id.* ¶ 46 (quoting *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007)). " 'All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction.' " *Id.* (quoting *Heastie*, 226 Ill. 2d at 543).

¶ 200    "While the threshold for permitting an instruction in a civil case is modest, the standard for reversing a judgment based on failure to permit an instruction is high." *Heastie*, 226 Ill. 2d at 543. Decisions about which jury instructions to use will not be reversed "unless the trial court has abused its discretion." *Id.* Our standard for determining whether a trial court abused its discretion is "whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." (Internal quotation marks omitted.) *Johnson*, 2025 IL App (1st) 230087, ¶ 46.

¶ 201    "Erroneous or incomplete instructions, however, do not necessarily require reversal of a judgment." *Id.* ¶ 65 (citing *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 34). A reviewing court "ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002). "Reversal is warranted if the error resulted in 'serious prejudice' to the [appellant's] right to a fair trial." *Studt*, 2011 IL 108182, ¶ 28.

¶ 202    This court's recent decision in *Johnson* extensively discussed the 2021 revision to IPI Civil No. 15.01, which corresponded with the Committee's withdrawal of prior instructions IPI Civil Nos. 12.04 and 12.05 discussing "sole proximate cause." IPI Civil No. 15.01, as modified, does not use the phrase "sole proximate cause." Instead, it states that, "However, if you decide that the defendant's conduct was not a proximate cause of the plaintiff's injury, then your verdict should be for the defendant[s]." IPI Civil No. 15.01. In *Johnson*, this court found that this sentence "does not state the law regarding the sole proximate cause defense with the specificity" required by our supreme court. *Johnson*, 2025 IL App (1st) 230087, ¶ 59.

¶ 203    In doing so, *Johnson* recognized our supreme court's holding that a defendant:

" 'has the right *not only* to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, *but also* has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries.' " (Emphases in original.) *Id.* ¶ 58 (quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 101 (1995)).

¶ 204    Our court explained that "*Leonardi* makes clear that, when supported by the evidence, a defendant is entitled to an explicit instruction 'that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries.' " *Id.* ¶ 59 (quoting *Leonardi*, 168 Ill. 2d at 101). However, "[r]evised IPI Civil No. 15.01 fails to provide such an instruction." *Id.* That is, "although sentence two of IPI Civil No. 15.01 is an accurate statement of law on proximate cause in general, it does not state the law regarding the sole proximate cause defense with the specificity *Leonardi* requires." *Id.*

¶ 205    *Johnson* found that the hospital defendant was entitled to a sole proximate cause instruction, insofar as there was some expert testimony that the plaintiff's injuries were caused solely by a medical condition, fetal growth restriction (FGR). *Id.* ¶ 60. Nonetheless, our court proceeded to explain that this error did *not* warrant reversal, because it could not conclude that defendant was seriously prejudiced. *Id.* ¶¶ 64-72. In doing so, it noted that "over the course of a three-week trial, the parties made it clear to the jury that causation was a pivotal issue in th[is] case" *Id.* ¶ 71. Our court also noted that the defendant hospital "spent the bulk of its defense attempting to prove" that the injuries resulted from FGR and that the timing of the child's delivery "made no difference." *Id.* Our court emphasized that we "do not presume serious prejudice from faulty jury instructions" and we will only reverse "if the jury was clearly misled." *Id.* ¶ 72 (citing *Schultz*, 201 Ill. 2d at 274). Our court was not persuaded that the jury

was clearly misled or that the hospital did not receive a fair trial, and thus concluded the hospital "was not seriously prejudiced by the trial court's refusal" to give the requested instruction. *Id.*

¶ 206    The same result is warranted on the record before us. Defendants' experts offered testimony that, due to the age and size of the pulmonary embolism, Darci could not have been saved, regardless of the treatment she received. Thus, there was some evidence entitling defendants to a sole proximate cause instruction. In turn, it was error to deny the requested instruction.

¶ 207    However, such error does not warrant reversal because defendants cannot show it caused them "serious prejudice" to their right to a fair trial. See *Studt*, 2011 IL 108182, ¶ 28. Similar to *Johnson*, this medical malpractice case involved a lengthy trial during which the parties made it clear that "causation was a pivotal issue." *Johnson*, 2025 IL App (1st) 230087, ¶ 71. Plaintiffs elicited multiple experts who testified that Darci could have been saved had defendants acted differently, whereas defendants called multiple experts who testified that the clot was too advanced to save her by the time she reached the emergency room. The jury's verdict reflects that it credited plaintiff's causation testimony over that of defendants. See *id.* (noting "It is not reasonable that the jury would have returned a verdict against [the hospital] if they believed that [the child's] disabilities were caused solely by FGR.").

¶ 208    Moreover, we cannot say the jury was "clearly misled" by the omission of a sole proximate cause instruction. See *id.* ¶ 72. We note that the jury was instructed (correctly) that it should return a defense verdict "if you decide that the defendant's conduct was not a proximate cause of the plaintiff's injury." We fail to see how defendant was denied a fair trial by the lack of an additional "sole proximate cause" instruction, nor are we persuaded that it would have made

any difference in the jury's verdict. Thus, we do not find defendants are entitled to reversal on this ground.

¶ 209                    Request for New Trial Based on the Size of the Verdict and Closing

Arguments

¶ 210        Apart from the foregoing, defendants claim they are entitled to a new trial because the record shows the verdict is excessive and based on improper passion or prejudice. In so doing, they claim the verdict was "tainted" and based on sympathy because the jury believed plaintiff and his son were "destined to live by themselves, without female companionship or comfort, for the rest of their lives." Defendants also assert the verdict was influenced by improper comments by plaintiff's counsel during closing argument. We find these claims unpersuasive.

¶ 211        A defendant must meet a very high standard to obtain a new trial on such grounds. The determination of damages "is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." (Internal quotation marks omitted.) *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 247 (2006). "Absent a clear indication in the record that the jury failed to follow some rule of law or considered some erroneous evidence, or that the verdict was the obvious result of passion or prejudice, a reviewing court will not upset the jury's assessment of damages." *Id.*

¶ 212        Although the verdict here was unquestionably large, on this record we cannot say it was the "obvious result of passion or prejudice." We keep in mind that Darci was only 49 years old when she died, and that her son, Ryan, was only 13 at the time. Plaintiff was entitled to seek recovery for the economic value of the loss of Darci's contributions to the family. Plaintiff was also entitled to seek compensation for Ryan's loss of society, *i.e.*, the loss of Darci's maternal love and guidance at a young age. See *Watson v. South Shore Nursing & Rehabilitation Center*,

*LLC* 2012 IL App (1st) 103730, ¶ 34 (citing decisions permitting recovery of loss of society to minor children of a deceased parent).

¶ 213    In arguing that the verdict was "tainted" by sympathy, defendants note that during closing argument, the jury heard the contents of a letter from Darci to her son when he was eight years old in which she expressed her love for him.[6] We recognize that "[i]t is error for counsel to appeal to the passions of the jury" and "[c]ounsel must confine closing arguments to matters that are in evidence and to reasonable inferences drawn from the evidence." *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 948 (2000). However, we do not find it was error for counsel to reference the letter during closing argument, especially as it had previously been admitted into evidence without objection. Although the letter undoubtedly had some emotional impact, we cannot say it was improper, let alone that it "tainted" the verdict. The letter was relevant to illustrate the relationship between Ryan and Darci; this was appropriate since the jury was asked to assign a value to the loss of society that Ryan suffered.

¶ 214    Defendants point to two other instances of allegedly improper closing argument as further grounds for new trial, but we find them unpersuasive. Notably, even improper comments during closing argument "are not reversible error unless substantial prejudice is shown." *McHale*, 2015 IL App (1st) 132625, ¶ 45. "A reviewing court will not grant a new trial unless the argument clearly was improper, prejudicial and denied defendant a fair trial when that trial is viewed in its entirety." *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1065 (2001).

¶ 215    The cited instances of improper closing argument do not mandate reversal. Defendants point out that plaintiff's counsel stated: "I suspect everyone sitting on this jury at some point

---

[6]Defense counsel objected by stating the letter was "not in evidence," but the court overruled the objection after noting that the letter had been previously admitted during Ryan's testimony.

has been in a hospital, either for care for themselves or family." Although defendants' objection was sustained, they urge that "the damage was done." While it is generally inappropriate "to ask the jury to put itself in the position of a plaintiff or defendant" (*Koonce v. Pacilio*, 307 Ill. App. 3d 449 (1999)), we do not see how such a brief, nonspecific comment about being in a hospital could possibly have prejudicial impact.

¶ 216    Defendants also contend that plaintiff's closing argument misinformed the jury that defense expert Dr. Cichon agreed the standard of care required Dr. Shenfeld to consider pulmonary embolism in the initial differential diagnosis, when in fact Dr. Cichon testified to the opposite. The transcript shows that plaintiff's counsel referenced a portion of Dr. Cichon's testimony in which Dr. Cichon agreed that he would have considered pulmonary embolism, had he been Darci's physician. Plaintiff's counsel proceeded to argue: "I submit to you *** that is a standard of care opinion offered by the expert *** that the attorneys for Dr. Shenfeld decided to hire *** telling you in so many words, PE should have been on his differential."

¶ 217    We note that defendants did not object to this portion of closing argument. In any event, we do not find it was error or that it misstated the evidence. Rather, plaintiff's counsel was making a permissible argument based on the evidence, *i.e.*, that Dr. Cichon's concession that he would have considered pulmonary embolism supported plaintiff's claim that Dr. Shenfeld should have done so earlier. Moreover, we note that the trial court instructed the jury that "what lawyers say in closing arguments is not evidence."

¶ 218    In short, we decline to find that the cited portions of closing argument, individually or cumulatively, prejudiced defendants' right to a fair trial.

¶ 219                          Defendants' Request for Remittitur

¶ 220    In the alternative to their arguments for a new trial, defendants request remittitur of the $25 million verdict, which they claim is excessive. They note that the trial judge herself described it as an "extraordinarily high" amount of damages. Again, defendants urge the verdict must have been the result of prejudice or passion, rather than a reasonable amount based on the evidence.

¶ 221    "The inherent power of a court to order a remittitur of excessive damages, in appropriate and limited circumstances, is long recognized and accepted." *Miyagi v. Dean Transportation, Inc.*, 2019 IL App (1st) 172933, ¶ 20. "A remittitur should be employed only when the damages award (1) falls outside the range of fair and reasonable compensation, (2) appears to be the result of passion or prejudice, or (3) is so large that it shocks the judicial conscience." *Id.* However, remittitur "should not be employed when the award falls within the flexible range of conclusions that can be reasonably supported by the facts." *Id.*

¶ 222    We do not find remittitur appropriate in this case. Although the amount of damages is very high, the injury to Darci's family was unquestionably severe.

¶ 223    We note that although the total verdict was $25 million, the substance of defendants' remittitur argument is essentially directed to $8.5 million of that total, consisting of the amounts awarded for plaintiff's grief and sorrow ($3.5 million) and his loss of society ($5 million). Defendants contend that plaintiff did not put on evidence to support such damages. They note that plaintiff's trial counsel acknowledged that he deliberately did *not* put on evidence about plaintiff's romantic life after Darci's death, in order to avoid "opening the door" to evidence about his subsequent relationship.

¶ 224    We recognize that the jury did not hear that the plaintiff began a new longstanding relationship following Darci's death. Nonetheless, we fail to see how that undermines the $3.5

million award for his "grief and sorrow." The jury heard plaintiff's testimony about his relationship and marriage with Darci, including his experience with her in the hospital and the immediate aftermath of her death. Certainly, the jury could find that plaintiff experienced severe grief, regardless of whether he subsequently developed a new romantic relationship. We are not in position to say that his later relationship would negate any part of the "grief and sorrow" damages.

¶ 225    The viability of the $5 million damages award for "loss of society" experienced by plaintiff presents a more difficult question under the facts of this case. There is some logic to defendants' argument that — insofar as plaintiff intentionally avoided eliciting evidence of his social life after Darci's death—the jury did not have a fair opportunity to accurately assess the extent to which plaintiff actually suffered in terms of lost companionship. Nonetheless, this argument essentially reiterates the defendants' prior claim that the trial court erred in barring the jury from hearing about plaintiff's subsequent relationship because it was relevant to damages for loss of consortium. As discussed *supra* ¶ 170, the trial court's decision on that point was consistent with long-standing precedent. Although that precedent could be revisited by the supreme court, we decline to disturb it now.

¶ 226    We are also unpersuaded by defendants' reliance on 2007 products liability decision in which this court found a $25 million loss of society award "shock[ed] the judicial conscience" and remanded for the trial court to conduct a hearing on the appropriate amount of remittitur. *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 674, 676 (2007), *vacated on other grounds*, 231 Ill. 2d 516 (2008). Defendants suggest that since that case found a $25 million award excessive, so is the total $25 million verdict in this case. However, as that decision acknowledged, this court does not engage in a "bare comparison of dollar figures" from other

cases to determine whether a particular award was excessive. See *id.* at 465. In any event, we point out that the real value of $25 million in 2007, when *Mikolajczyk* was decided, was far more than what it is today.

¶ 227    We reiterate that the jury apparently accepted the plaintiffs' theory that, due to defendants' negligence, 49-year old Darci died, leaving behind plaintiff and their 13-year-old son. While there is no doubt that the total verdict of $25 million was very high, we cannot say that it falls outside the range of fair and reasonable compensation, appears to be the result of passion or prejudice, or is so large that it shocks the judicial conscience. Thus, we decline the request for remittitur.

¶ 228                    Challenges to the Constitutionality of the Prejudgment Interest Award

¶ 229    Finally, we address defendants' arguments regarding the award for prejudgment interest. Defendants assert multiple reasons why the authorizing statute (735 ILCS 5/2-1303(c) (West 2022)) (hereinafter the "PJI statute") violates the Illinois and United States Constitutions. However, such challenges have been previously examined and rejected by our court.

¶ 230    In 2021, the legislature added subsection (c) to section 2-1303 of the Code of Civil Procedure. Pub. Act 102-6, § 5 (eff. July 1, 2021) (amending 735 ILCS 5/2-1303). "Until the 2021 amendment, Illinois did not permit recovery of prejudgment interest in personal injury and wrongful death actions." *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶ 43. The PJI statute, in relevant part, provides:

"In all actions brought to recover damages for personal injury or wrongful death ***, the plaintiff shall recover prejudgment interest on all damages *** set forth in the judgment. Prejudgment interest shall begin to accrue on the date the action is filed. *** In entering judgment for the plaintiff in the action, the court shall add to the amount of the judgment

interest calculated at the rate of 6% per annum on the amount of the judgment, minus punitive damages, sanctions, statutory attorney's fees, and statutory costs." 735 ILCS 5/2-1303(c) (West 2022).

¶ 231     It also provides: "For any personal injury or wrongful death occurring before the effective date of this amendatory Act *** the prejudgment interest shall begin to accrue on the later of the date the action is filed or the effective date of this amendatory Act of the 102nd General Assembly." *Id.*

¶ 232     There is a strong presumption that legislation is constitutional, and "[a] party challenging the constitutionality of a statute bears the heavy burden of clearly establishing a constitutional violation." *Rowe v. Raoul*, 2023 IL 129248, ¶ 20. Whether a statute is constitutional is a question of law subject to *de novo* review. *Id.*

¶ 233     Dr. Shenfeld's brief asserts (in conclusory fashion) that the statute is unconstitutional for several reasons. He claims that it punishes a defendant who exercises his right to a jury trial, usurps the jury's function with respect to damages, violates the special legislation clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 13) and the defendant's equal protection rights under the state and federal constitutions (Ill. Const. 1970, art. I, § 2; U.S. Const., amend. XIV), violates the separation of powers provision of the Illinois Constitution, violates due process by penalizing a defendant for delays in litigation even if caused by plaintiff, "allows for double recovery," and "is fundamentally unfair." "Such cursory arguments on matters of constitutional law generally result in forfeiture and will not be considered by a reviewing court." *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 119 (criticizing similar "cursory recitations" of previously rejected challenges to the PJI statute.)

¶ 234      In any event, this court has repeatedly discussed and rejected such challenges to the constitutionality of the PJI statute. See *Galich v. Advocate Health & Hospital Corp.*, 2024 IL App (1st) 230134; *Cotton*, 2023 IL App (1st) 220788. We see no reason to depart from the analysis in that precedent.

¶ 235      In its brief, Advocate challenges the prejudgment interest award on the ground that the complained-of injury here occurred in 2016, years before the PJI statute was enacted in July 2021. Advocate contends that application of the statute here violates the constitutional principle that "due process considerations prohibit retroactive impairment of a vested right." Again, this court has already considered and rejected the same argument, recognizing (1) the PJI statute is not retroactive but specifies that interest only accrues after its effective date, and (2) defendants had no "vested interest" in a preexisting rule of law. *Galich*, 2024 IL App (1st) 230134, ¶¶ 83-85; see *Cotton*, 2023 IL App (1st) 220788, ¶ 68-70 (explaining that the PJI statute "is not retroactive in its application" and that defendants otherwise "have no vested right in a particular remedy or procedure").

¶ 236      Finally, we note Advocate otherwise contends that application of the statute is unfair in this case because plaintiff caused multiple delays by "abusing the discovery process" through "overly burdensome, incomprehensible discovery demands" and related motion practice. Advocate does not cite any legal authority to suggest that an award of prejudgment interest should be reduced upon consideration of whether the plaintiff improperly delayed the litigation. In any event, Advocate does not identify adequate support in the record to prove that plaintiff's counsel acted in bad faith. Indeed, Advocate acknowledges that the court denied its motion for sanctions against plaintiff's counsel; Advocate does not appeal that ruling. We thus

have no basis in law or in the record to invalidate the prejudgment interest award due to plaintiff's counsel's alleged discovery abuses.

¶ 237     In short, we reject all of defendants' challenges to the trial court's award of prejudgment interest.

¶ 238                                    CONCLUSION

¶ 239     In summary, we find that defendants were not entitled to judgment notwithstanding the verdict or that the verdict was against the manifest weight of the evidence. We reject defendants' claims that erroneous rulings entitled them a new trial. We also find that defendants were not entitled to a remittitur, and we reject defendants' attacks on application of the prejudgment interest statute. We thus affirm the judgment on the jury verdict in plaintiff's favor.

¶ 240     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 241     Affirmed.

---

*White v. Advocate Condell Medical Center*, 2026 IL App (1st) 240450

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-8040; the Hon. Bridget Hughes, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert L. Larsen, of Cunningham, Meyer & Vedrine, P.C., of Warrenville, for appellant Advocate Condell Medical Center. |
| | Julie A. Teuscher, Brian J. Hickey, and Erin V. Calandriello, of Cassiday Schade LLP, of Chicago, for other appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Michael W. Rathsack, of Park Ridge, for appellee. |

---